PAUL J. PERLIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PAUL J. PERLIN, AND HENRY E. HERSHEY AND ELLEN K. HERSHEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 26381-82, 20634-83.[1]   Filed March 19, 1986.

*Thomas C. Hundley, Bruce M. Reynolds, Frederic W. Hickman, Bradford L. Ferguson, Peter B. Freeman,* and *Michael A. Clark,* for the petitioners.

*Theodore J. Kletnick, Cynthia J. Mattson,* and *Kendall C. Jones,* for the respondent.

KÖRNER, *Judge*: Respondent determined deficiencies in Federal income taxes against petitioners Paul J. Perlin, Henry E. Hershey, and Ellen K. Hershey (hereinafter collectively referred to as petitioners) as follows:

| Petitioner(s) | Docket No. | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| Paul J. Perlin | 26381-82 | 1978 | [2]$498,161 |
| | 20634-83 | 1979 | 20,398 |
| | 20634-83 | 1980 | 687,033 |
| Henry E. Hershey and | 20634-83 | 1979 | 152,245 |
| Ellen K. Hershey | 20634-83 | 1980 | 646,979 |

[1]The instant cases were consolidated by Order of this Court on June 1, 1984.

[2]By answer filed Jan. 7, 1983, in docket No. 26381-82, respondent indicated that as a result of certain computational adjustments, the deficiency should be $302,412.54 rather than $498,161.

By amended answers filed October 1, 1984, in docket Nos. 26381-82 and 209634-83, respondent claimed additional deficiencies in unspecified amounts against petitioners pursuant to section 6621(d).[3]

After concessions, the issues remaining for decision are: (1) Whether petitioners' investments in certain commodity straddles for the taxable year ending December 31, 1980, were sham transactions, devoid of the requisite economic substance; (2) whether petitioners' investments in commodity straddle transactions for the taxable years ending December 31, 1978, through December 31, 1980, satisfied the entered into for profit requirement of section 108 of the Tax Reform Act of 1984 ( the act );[4] and (3) whether petitioners are liable for additional interest pursuant to section 6621(d) for the taxable years ending December 31, 1978, through December 31, 1980.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

### General Background

As of the dates of filing, the petitions in docket Nos. 26381-82 and 20634-83, petitioner Paul J. Perlin (Perlin) resided in Chicago, Illinois. For the calendar years 1978, 1979, and 1980, Perlin timely filed individual income tax returns, using the cash method of accounting.

Petitioners Henry E. Hershey (Hershey), and Ellen K. Hershey (collectively the Hersheys), husband and wife, resided in Lexington, Kentucky, at the time the petition in docket No. 20634-83 was filed. For the calendar years 1979 and 1980, the Hersheys timely filed joint income tax returns using the cash method of accounting.

Hillbrook Farm, Inc. (Hillbrook) (formerly Hilltop View Farm, Inc.) is a Kentucky corporation. During 1978, 1979, and 1980, Hillbrook was an electing small business corpora-

---

[3]All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

[4]Division A of the Deficit Reduction Act of 1984, 98 Stat. 494.

tion pursuant to section 1372 and filed an information return for subchapter S corporations for each of such years using the cash method of accounting.

In 1958, at the age of 15, Perlin began working at the Chicago Board of Trade (CBOT) as a commodities clerk. In September 1964, Perlin became a member of the CBOT and began trading as a floor trader[5] in commodity futures contracts. Except for brief interruptions, Perlin was a trader from 1964 through 1983, inclusive.

In January 1978, Perlin formed Hilltop View Farm, Inc. (Hilltop), contributing thoroughbred horses and a horse farm he owned in exchange for all of Hilltop's stock. Hershey was employed as an officer of Hilltop with the responsibility of running the horse farm. On March 15, 1978, Perlin sold one-half of his shares of stock in Hilltop to Hershey, in return for a note in the amount of $250,000. On that same date, Perlin commenced trading in commodity futures contracts on behalf of Hilltop.

Although Perlin and Hershey both were employed by Hilltop, they agreed that they both could have outside business interests. Hershey continued as a partner in another horse operation, Hillbrook Farm, while Perlin continued to trade commodity futures on his own behalf.

During the summer of 1979, Hershey and Perlin agreed that they would both devote their full energies to the operation of Hilltop. They agreed that Perlin would trade only for Hilltop and that the Hersheys would purchase the interests of the other partners in Hillbrook Farm and would transfer their interest in the assets of Hillbrook Farm to Hilltop, as part of a recapitalization of Hilltop. As a result, Perlin liquidated any open futures positions he had in his own name at that time. On October 1, 1979, the Hersheys purchased the interests of the other partners of Hillbrook Farm. On December 21, 1979, the stock ownership of Hilltop was restructured as part of a recapitalization, and the ownership of Hilltop became as follows: Perlin - 50 percent; Henry Hershey - 37 percent; and Ellen Hershey - 13 percent. This ownership continued through 1983. At the

---

[5]In this opinion, we will be using the term "trader" to refer to a professional commodities trader who is a member of the CBOT. In contrast, we will use the term "investor" to refer to a person who is not a member of the CBOT, but invests in commodity futures through the use of a broker.

time of the recapitalization, Hilltop changed its name to Hillbrook Farm, Inc.

During 1978, 1979, and 1980, Hershey's primary responsibility was to manage and operate the horse operation of Hillbrook. Perlin's primary responsibility during those years was to plan and execute the trading of Hillbrook in commodity futures contracts. Ellen Hershey was not involved in the management or operation of Hillbrook during those years.

The deficiencies in the instant cases relate solely to the tax consequences of four straddle transactions:

| Name | Established | Liquidated |
|---|---|---|
| 1. Silver Straddle | Apr. 13, 1978 | Jan. 10, 1979 |
| 2. Soybean Straddle | July 31, 1979 | Jan. 3, 1980 |
| 3. T-Bond Straddle No. 1 | Oct. 11, 1979 | Jan. 6, 1981[6] |
| 4. T-Bond Straddle No. 2 | June 26, 1980 | Mar. 24, 1982[6] |

The Silver Straddle was established solely on behalf of Perlin, individually. The Soybean Straddle and both U.S. Treasury Bond (T-Bond) Straddles were entered into by Perlin on behalf of Hillbrook.

### General Elements of Commodity Futures Trading

A detailed description of commodity futures is not necessary.[7] Here we are primarily concerned with straddles and butterfly straddles. A straddle[8] position is established by simultaneously holding a long position (a contract to buy) in one delivery month and a short position (a contract to sell) in another delivery month, with respect to the same

---

[6]Pursuant to sec. 509 of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 333-334, and sec. 5c. 1256-2, Temporary Income Tax Regs., T.D. 7826, 47 Fed. Reg. 38688 (Aug. 27, 1982), as amended by T.D. 7841, 47 Fed. Reg. 49391 (Oct. 27, 1982), petitioners have elected to have the mark-to-market rules of sec. 1256 apply to all straddle positions held by Hillbrook during 1981. As such, the tax consequences of the trades executed in T-Bond Straddle Nos. 1 and 2, during 1981 are not in issue. The tax consequences of the trades executed in T-Bond Straddle No. 2 during 1982 have not been placed in issue, for apparently similar reasons.

[7]A description of the basic terms and the mechanics of commodity futures trading can be found in *Miller v. Commissioner*, 84 T.C. 827, at 828-830 (1985), on appeal (10th Cir., Nov. 20, 1985); *Smith v. Commissioner*, 78 T.C. 350, at 354-357 (1982); and *Landreth v. Commissioner*, T.C. Memo. 1985-413.

[8]Traders at the CBOT refer to a straddle position as a "spread." The two terms are synonymous. See Auster, "Understanding the Tax Aspects of Commodities Markets: Futures and Options," 3 J. Taxation Investments 128-129 (Winter 1986). Because the Code sections addressing this area use the term "straddle" we have chosen to do the same.

commodity.[9] For example, if one buys a contract in May 1985 soybeans and sells a contract in July 1985 soybeans, he has established a straddle, long May soybeans and short July soybeans. The two separate delivery months, May and July, are called legs of the straddle.

A butterfly straddle is a combination of two straddles, involving 3 contract months with at least four legs. The following diagram represents an example of a perfect butterfly:

| 1 Long March Soybeans | 1 Long July Soybeans |
|:---:|:---:|
| (Wing) | (Wing) |

2 Short May Soybeans
(Body)

In a perfect butterfly straddle, the number of contracts involved in each wing will be one-half of the number of contracts involved in the body. A butterfly may also be imperfect. An example of an imperfect butterfly would be as follows:

| 4 Long March Soybeans | 6 Long July Soybeans |
|:---:|:---:|
| (Wing) | (Wing) |

10 Short May Soybeans
(Body)

The profit or loss potential of a straddle or butterfly straddle is not based on absolute price movements in the legs, but rather is measured by the increase or decrease in the price differential between the long and short contracts. The price movement for 1 delivery month will rarely equal the price movement of another delivery month, and this difference in magnitude of the price movements produces a net gain or loss on the straddle. This net position, which measures the profitability of the straddle, will be referred to as the straddle differential or the net equity in the straddle. As an example, a person holding the perfect butterfly discussed above, would profit, before costs, if the price of the May short soybean contracts decreased more or increased less relative to the prices of the March and July long soybean contracts.

Different positions in futures contracts have different degrees of risk. An outright long or short position is much

___
[9]A straddle may be achieved in one of two ways: (1) By trading each leg separately (e.g., taking a long position in May 1985 soybeans and a short position in July 1985 soybeans), or (2) by taking both positions in one simultaneous transaction.

more risky than a straddle position. As a general rule, a straddle which has a longer period of time between delivery months will have a greater potential for profit and loss. For example, a May-December straddle generally will have a greater profit and loss potential than a May-July straddle. Because a butterfly straddle entails two opposite straddles (a long and a short), the degree of risk and profit potential in butterflies is smaller than that of an ordinary straddle. The risk is smaller still if the butterfly is perfectly balanced. As the distance between the body and the wings of a butterfly is increased, so is the profit potential and risk of loss. For example, a January, May, September butterfly will have a greater profit/loss potential than a March, May, June butterfly.

A switch or rollover occurs when one leg of the straddle is closed out and is replaced by a new leg so that the straddle position is maintained. Whenever a switch occurs, tax consequences normally will result: either a realized gain or loss on the leg which is closed out. Thus, one can produce a loss for tax purposes by establishing a straddle and waiting for some movement in the price of the legs. Because the straddle trader has both a long position and a short position, fluctuation in the price of the underlying commodity typically will result in a gain in one leg and a loss in the other. The losing leg can then be closed out, recognizing the loss, and it can then be replaced with a similar position, at a new but lower cost, so that the risk of the overall position remains essentially the same. The gain on the other leg, of course, will eventually have to be recognized, but this can be deferred until a later year.

To reiterate, the potential net profits or losses of a straddle are measured by the price differential in the legs and, as such, are generally smaller than the gross gain or loss on any individual leg of the straddle. It follows that because it is the differential, not the separate legs, which measures the trader's net profit or loss potential, the gains and losses for tax purposes are generally larger than the trader's actual exposure to risk.

Straddles and switch transactions are not used exclusively for their tax consequences. A straddle rather than an outright position may be used, for example, if the trader

wants to hold the position for a longer period of time, since the fluctuations in price tend to be slower in a straddle than in an outright position. A switch may be used in a butterfly straddle, for example, to widen or narrow the distance between the body and the wings and thus increase or decrease the profit potential and risk of loss.

## The Alleged Sham Transactions

All trades made at the CBOT must be cleared through the Chicago Board of Trade Clearing Corp. (the Clearing Corp.). Although there are rules and procedures governing the treatment of trades which fail to clear at the end of the day, no binding futures contract exists unless and until an executed trade has been cleared through the Clearing Corp. To facilitate this process, traders use trading cards to record their trades. The trading cards contain information such as the time of the trade, the broker who executed the trade, and the quantity of contracts bought and sold. After the trade is executed, the trading card is filled out by the trader, and it is submitted for the clearing process. The badge initials of the opposing trader are marked on the trading cards, and the trading participants are required to check the accuracy of the information on the trading cards after the trade is executed. A trade will not fail to clear, however, if an error is made in writing down the opposing broker's initials.

During the years in issue, the majority[10] of trades in T-Bond Straddle Nos. 1 and 2 were executed by Perlin through the use of a broker. However, Perlin, himself, executed trades for T-Bond Straddle Nos. 1 and 2 in the Treasury Bond Pit on the floor of the CBOT on the following days: November 11, 1980, December 9, 1980, and December 12, 1980.

On November 11, 1980, a 75-contract butterfly straddle (75 long June 1981; 150 short September 1981; 75 long

---

[10]The total number of trades executed in T-Bond Straddle No. 1 through Dec. 31, 1980, was 51. Thirty-five, or 69 percent, of these trades were executed using Albert Vose (Vose) as the broker. Of the 15 trades made by Perlin, 3, or 20 percent, of these were executed with Vose as the opposing broker. Thirty-six trades were executed in T-Bond Straddle No. 2 through Dec. 31, 1980. Nineteen, or 53 percent, of these trades were executed with Vose as the broker. Of the nine trades executed by Perlin, seven, or 78 percent, were traded with Vose as the opposing broker.

December 1981) was purchased for T-Bond Straddle No. 1. Of the 300 contracts actually traded, 186 of these contracts (75 long June 1981; 93 short September 1981; 18 long December 1981) were traded by Albert Vose (Vose) on behalf of Perlin against various other traders. Perlin and Vose's trading cards reflect that the remaining 114 contracts (57 short September 1981; 57 long December 1981) were traded by Perlin with Vose. The latter trade resulted in a long-term capital loss of $252,937.50 and a short term capital gain of $735,656.25 to Hillbrook, as the result of closing out previously held opposing positions for the same delivery months.

Also on November 11, 1980, a 150-contract T-Bond straddle (150 short September 1982; 150 long March 1983) was purchased for T-Bond Straddle No. 2. Perlin and Vose's trading cards reflect that this trade was executed by Perlin with Vose. This trade resulted in a short-term capital loss of $1,767,187.50 to Hillbrook.

On December 9, 1980, there was a purchase of a 102-contract T-Bond straddle (long December 1982; short March 1983) and a sale of the same 102-contract straddle (102 short December 1982; 102 long March 1983) for T-Bond Straddle No. 1. Perlin and Vose's trading cards reflect that Perlin sold a 102-contract straddle to Scott Luttrell (Luttrell) and that Perlin bought a 102-contract straddle from Vose. Luttrell's trading card, however, indicates that Luttrell executed the 102-contract straddle directly with Vose. Both Luttrell and Perlin's trade registers[11] reflect that Luttrell made the trade with Perlin, not with Vose, on behalf of Perlin. The trade produced a short-term capital gain of $981,750 and a short-term capital loss of $946,687.50 for Hillbrook.

On December 12, 1980, a 50-contract T-Bond straddle (50 short March 1983; 50 long June 1983) was purchased for T-Bond Straddle No. 2. Perlin and Vose's trading cards reflect that this trade was executed by Perlin with Vose. The trade resulted in a short-term capital loss of $170,312.50 for Hillbrook.

---

[11]Trade registers are printed by the Clearing Corp. each day after the close of trading and show all of the trades which were reported and cleared for that particular day.

The following table summarizes the realized gains and losses from the aforementioned transactions:

| Trade date | Straddle | Realized gain/(loss) | Character of capital gain/loss |
|---|---|---|---|
| Nov. 11, 1980 | T-Bond No. 1 | ($252,937.50) | Long term |
| Nov. 11, 1980 | T-Bond No. 1 | 735,656.25 | Short term |
| Nov. 11, 1980 | T-Bond No. 2 | (1,767,187.50) | Short term |
| Dec. 9, 1980 | T-Bond No. 2 | 981,750.00 | Short term |
| Dec. 9, 1980 | T-Bond No. 2 | (946,687.50) | Short term |
| Dec. 12, 1980 | T-Bond No. 2 | (170,312.50) | Short term |

## The Straddle Transactions

### A. The Silver Straddle.

In April 1978, Perlin initiated the Silver Straddle, which is the straddle in issue in docket No. 26381-82. The Silver Straddle was maintained in Perlin's own account and is depicted on pages 398-399.

As the table on pages 398-399 indicates, the initial configuration in the Silver Straddle was a perfect butterfly straddle. Though this configuration was later changed into more complicated configurations, throughout the life of the straddle a balanced position was maintained (i.e., the total number of long contracts exactly offset the total number of short contracts).

During 1978, Perlin utilized switch transactions in the Silver Straddle to realize short-term capital losses as follows:

| Date | Amount of loss | Table reference |
|---|---|---|
| Apr. 28, 1978 | ($140,000) | First transaction |
| Sept. 27, 1978 | (155,250) | Third transaction |
| Oct. 3, 1978 | (111,250) | Fourth transaction |
| Oct. 5, 1978 | (82,500) | Fifth transaction |
| Oct. 6, 1978 | (7,360) | Sixth transaction |
| Total | (496,360) | |

In January 1979, Perlin liquidated the Silver Straddle as follows:

| Date | Long-term capital gain | Short-term capital gain(loss) | Net gain/(loss) | Table reference |
|---|---|---|---|---|
| 1/05/79 | $696,870 | ($341,250) | $355,620 | Seventh transaction |
| 1/08/79 | 183,750 | (45,750) | 138,000 | Eighth transaction |
| 1/10/79 | 105,950 | (105,950) | --- | Ninth transaction |
| | 986,570 | (492,950) | 493,620 | |

According to the table, the net equity (i.e., the straddle differential) in the Silver Straddle based on the unrealized gain/loss in the straddle as offset by the realized gain/loss in the straddle on actual trade dates (hereinafter referred to as the net equity based on actual prices), ranged from a negative $12,706 on October 6, 1978, to a negative $249 on June 23, 1978. The net equity in the straddle based on settlement prices[12] ranged from a positive $18,500 on August 3, 1978, to a negative $56,730 on November 14, 1989, and fluctuated by as much as $50,000 in a single day.

The overall performance of the Silver Straddle was a loss of $2,740, calculated as follows:

| 1978 | Short-term capital loss | ($496,360) |
|------|------------------------|-----------|
| 1979 | Long-term capital gain | 986,570 |
| 1979 | Short-term capital loss | (492,950) |
| | Overall loss | (2,740) |

Several factors cause the straddle differential for silver futures contracts to fluctuate. These factors include the price trend of silver and the cost of carrying silver.

According to general theory, if silver prices are increasing, the prices for distant delivery months should increase more than prices for nearby months. In such event, a straddle short the nearby month and long the faraway month, would result in profits. Here, spot silver prices increased from an average of $4.70 per ounce in December 1977, to $6.25 an ounce in January 1979, the month the silver straddle was liquidated. Futures prices also increased. The nearest Commodity Exchange of New York (COMEX)[13] silver contract, which closed at $5.29 at the end of February 1978, just before these silver trades, closed at $6.51 at the

---

[12]Daily settlement prices are determined by the pit committee for each commodity traded at the CBOT shortly after the market closes. The settlement prices are generally somewhere in the range of the prices traded near the close of trading. Though it would appear that the net equity figures based on settlement prices should be rejected (since they are somewhat artificial) in favor of the net equity figures based on actual prices, the settlement prices are important because they provide us with a measure of profit and loss potential. This is true because the net equity figures based on settlement prices dictate the amounts which must be deposited in or may be withdrawn from the trader's margin account at the end of each day, whether or not trades were actually executed. Therefore, fluctuations in net equity had a direct impact on petitioners' cash flow even though no gain or loss was realized for tax purposes under pre-1981 law until the contract was disposed of.

[13]Although the Perlin trades involved CBOT contracts, the prices of the Chicago silver futures move closely with the COMEX prices.

## SILVER STRADDLE 1978-1979

| | Contracts: Long or (Short) | | | | | | | | | | Current balance long/(short) | Gain (loss) realized | Cumulative Unrealized gain (loss) in account | Net equity in account |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Feb. 1979 | Apr. 1979 | Jun. 1979 | Aug. 1979 | Oct. 1979 | Dec. 1979 | Feb. 1980 | Apr. 1980 | Jun. 1980 | Aug. 1980 | | | | |
| **Initial transaction 4/13/78** | | | | | | | | | | | | | | |
| Trade | | | 50 | (100) | 50 | | | | | | | | | |
| Position | | | 50 | (100) | 50 | | | | | | 100-(100) | N/A | ($500) | ($500) |
| **First transaction 4/28/78** | | | | | | | | | | | | | | |
| Trade | | 50 | (50) | | (50) | 50 | | | | | | | | |
| Position | | 50 | 0 | (100) | 0 | 50 | | | | | 100-(100) | ($140,000) | 131,000 | (9,000) |
| **Second transaction 6/23/78** | | | | | | | | | | | | | | |
| Trade | | | | 100 | | | 200 | (400) | 200 | | | | | |
| Position | | 50 | 0 | (100) | 0 | 50 | 200 | (400) | 200 | | 500-(500) | (140,000) | 139,751 | (249) |
| **Third transaction 9/27/78** | | | | | | | | | | | | | | |
| Trade | | | (25) | 50 | (25) | (150) | | 300 | | (150) | | | | |
| Position | | 50 | (25) | (50) | (25) | (100) | 200 | (100) | 200 | (150) | 450-(450) | (155,250) / (295,250) | 287,124 | (8,126) |
| **Fourth transaction 10/3/78** | | | | | | | | | | | | | | |
| Trade | (25) | | | 50 | 25 | (50) | | | | | | | | |
| Position | (25) | 50 | (25) | 0 | 0 | (150) | 200 | (100) | 200 | (150) | 450-(450) | (111,250) / (406,500) | 404,751 | (1,749) |
| **Fifth transaction 10/5/78** | | | | | | | | | | | | | | |
| Trade | | | | | | (22) | | 44 | | (22) | | | | |
| Position | (25) | 50 | (25) | 0 | 0 | (172) | 200 | (56) | 200 | (172) | 450-(450) | (82,500) / (489,000) | 484,250 | (4,750) |

*1978 Transactions*

## SILVER STRADDLE 1978-1979
### (continued)

| | CONTRACTS: LONG OR (SHORT) | | | | | | | | | | Current balance long/(short) | Gain (loss) realized | CUMULATIVE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Feb. 1979 | Apr. 1979 | Jun. 1979 | Aug. 1979 | Oct. 1979 | Dec. 1979 | Feb. 1980 | Apr. 1980 | Jun. 1980 | Aug. 1980 | | | Unrealized gain (loss) in account | Net equity in account |
| **1978 TRANSACTIONS** | | | | | | | | | | | | | | |
| **Sixth transaction** 10/6/78 | | | | | | | | | | | | | | |
| Trade | | | | | | (2) | | 4 | | (2) | | ($7,360) | | |
| Position | (25) | 50 | (25) | 0 | 0 | (174) | 200 | (52) | 200 | (174) | 450-(450) | ¹(496,360) | $483,654 | ($12,706) |
| **1979 TRANSACTIONS** | | | | | | | | | | | | | | |
| **Seventh transaction** 1/5/79 | | | | | | | | | | | | | | |
| Trade | (25) | 50 | (25) | | | 174 | (174) | (52) | (174) | 174 | | 355,620 | | |
| Position | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 26 | 0 | 102-(102) | 355,620 | 137,875 | (2,865) |
| **Eighth transaction** 1/8/79 | | | | | | | | | | | | | | |
| Trade | 25 | (50) | 25 | | | | | | | | | 138,000 | | |
| Position | 0 | 0 | 0 | 0 | 0 | 0 | 26 | (52) | 26 | 0 | 52-(52) | 493,620 | 0 | (2,740) |
| **Ninth transaction** 1/10/79 | | | | | | | | | | | | | | |
| Trade | | | | | | | (26) | 52 | (26) | | | 0 | | |
| Position | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0-0 | ²493,620 | N/A | (2,740) |

¹Claimed on 1978 tax return as short-term capital loss.
²Claimed on 1979 tax return as a long-term capital gain of $986,570 as offset by a short-term capital loss of $492,950 ($986,570 − $492,950=$493,620)

end of December 1978, and at $7.09 at the end of January 1979.

The carrying costs are the cost of borrowing money (i.e., interest) to take possession of the actual commodity and the cost of storing the commodity. As these costs increase, the cost of taking delivery of silver and holding it for future use also increases, producing a similar increase in the value of contracts for more distant delivery months relative to the value of contracts for more nearby months. Under general theory, a rise in interest rates will result in profits in a straddle where the straddle is short the nearby month and long the faraway month. Also, according to general theory, if interest rates fall, a trader will profit if he is long the nearby month and short the faraway month. Between April 1978 and January 1979, straddle differentials also widened because the cost-of-carry per ounce per month increased due to short-term interest rates rising throughout 1978. For example, from March 1978 to January 1979, 3-month Treasury bill rates increased from approximately 6 percent to 9.3 percent.

### B. The Soybean Straddle

On July 31, 1979, Perlin, on behalf of Hillbrook, established the Soybean Straddle by buying three long March 1980 soybean futures contracts and selling three short May 1980 soybean futures contracts. The Soybean Straddle is depicted by the table on page 401.

As the table on page 401 indicates, the initial configuration in the account was a simple straddle. On August 28, 1979, Perlin expanded the size of the Soybean Straddle by executing a 125-contract butterfly straddle which resulted in a short-term capital loss of $487.50. At this point in time, the Soybean Straddle was an imperfect butterfly straddle and it remained in this configuration, with slight modifications, until the straddle was liquidated on January 3, 1980. Throughout the series of transactions affecting this straddle, a balanced position was maintained.

Perlin utilized day trades[14] on December 13, 1979, and December 28, 1979, to realize short-term capital losses of

---

[14]Discussed *infra*.

## SOYBEAN STRADDLE 1979-1980

| | Contracts: Long or (Short) | | | | Current balance long/(short) | Gain (loss) realized | Cumulative | |
|---|---|---|---|---|---|---|---|---|
| | Jan. 1980 | Mar. 1980 | May 1980 | Jul. 1980 | | | Unrealized gain (loss) in account | Net equity in account |
| **1979 Transactions** | | | | | | | | |
| **Initial transaction 7/31/79** | | | | | | | | |
| Trade | | 3 | (3) | | | | | |
| Position | | 3 | (3) | | 3-(3) | N/A | $300 | $300 |
| **First transaction 8/28/79** | | | | | | | | |
| Trade | (25) | 50 | (25) | | | | | |
| Position | (22) | 47 | (25) | | 47-(47) | ($488) | $300 | (1,038) |
| **Second transaction 12/13/79** | | | | | | | | |
| Trade | 47 | | (47) | | | | | |
| Position | 0 | (22) | 47 | (25) | 47-(47) | (94,587) / (95,075) | 550 | (2,650) |
| **Third transaction 12/28/79** | | | | | | | | |
| Trade | 40 | | (40) | | | | | |
| Position | 0 | (22) | 47 | (25) | 47-(47) | (30,000) / [1](125,075) | 92,425 | (3,288) |
| **1980 Transactions** | | | | | | | | |
| **Fourth transaction 1/03/80** | | | | | | | | |
| Trade | | 22 | (47) | 25 | | | | 121,787 |
| Position | 0 | 0 | 0 | 0 | 0-0 | 121,275 / [2]121,275 | N/A | (3,800) |

[1] Claimed on 1979 tax return as short-term capital loss.
[2] Claimed on 1980 tax return as short-term capital gain.

$94,587 and $30,000, respectively. On January 3, 1980, the liquidation of the Soybean Straddle resulted in a short-term capital gain of $121,275. The net equity in the straddle based on actual prices ranged from a positive $300 on July 31, 1979, to a negative $3,800 on January 3, 1980. The net equity based on settlement prices ranged from a positive $5,400 on September 14, 1979, to a negative $4,625 on October 9, 1979, and fluctuated by as much as $4,000 in a single day. The overall performance of the straddle was a loss of $3,800 consisting of:

| 1979 | Short-term capital loss | ($125,075) |
|------|------------------------|------------|
| 1980 | Short-term capital gain | 121,275 |
|      | Overall loss | (3,800) |

A variety of factors affect the straddle differential in soybean future contracts. The most important appear to be market conditions and carrying costs.

During the early part of 1979 soybean prices were generally increasing. After July 1979, however, the soybean price picture changed and soybean prices moved downward. Weather in the United States was unusually favorable and, although a huge crop had been forecast and was in essence already taken account of in the market, growing conditions were better than anticipated, so the bumper crop was even larger than forecast. In addition, there was also a bumper crop in Brazil, the largest producer outside the United States. Other world supplies were stable. On the demand side, there was a heavy oil seed supply relative to demand in competing oil products, such as palm oil and coconut oil. Around Christmas of 1979, the Soviet Union invaded Afghanistan and, although the grain embargo did not take place until January 1980, rumors and reports of the impending embargo did depress prices and added an additional element of uncertainty and volatility to the market. Additionally, the dollar strengthened as a result of high U.S. interest rates which caused export demand to fall, since a stronger dollar means that it costs foreigners more, in their own currency, to buy U.S. goods. The rising interest rates, due partially to a change in Federal Reserve policy on October 6, 1979, predictably increased carrying costs and thus, widened the straddle differential.

## C. T-Bond Straddle No. 1

On October 11, 1979, Perlin, on behalf of Hillbrook, initiated T-Bond Straddle No. 1 by establishing a 150-contract T-Bond butterfly straddle. T-Bond Straddle No. 1 is depicted by the table on pages 404-405.

As the table on pages 404-405 indicates, the initial configuration in T-Bond Straddle No. 1 was a perfect butterfly straddle. Although this configuration was later changed into more complicated configurations, throughout the life of the straddle a balanced position was maintained.

During 1979, switch transactions were utilized in T-Bond Straddle No. 1 to realize short-term capital losses as follows:

| Date | Amount of loss | Table reference |
|------|---------------|-----------------|
| Oct. 23, 1979 | ($937,500) | First transaction |
| Dec. 28, 1979 | (40,312) | Second transaction |
| Total | (977,812) | |

The overall performance of T-Bond Straddle No. 1 was a loss of $2,094 computed as follows:

| | | |
|------|---------------------------|-----------|
| 1979 | Short-term capital loss | ($977,812) |
| 1980 | Short-term capital gain | 120,030 |
| 1980 | Long-term capital loss | (332,812) |
| 1981 | Short-term capital gain | 714,156 |
| 1981 | Long-term capital gain | 474,344 |
| | Overall loss | (2,094) |

The net equity in the straddle based on actual prices ranged from $0 on October 11, 1979, to a negative $43,188 on January 29, 1980. The net equity based on settlement prices ranged from a positive $3,937 on December 12, 1980, to a negative $49,970 on May 29, 1980, and varied by as much as $20,000 in a single day.

The primary considerations affecting straddle differentials in T-Bonds are changes in short-term interest rates. As the interest rates become more volatile, so do changes in the straddle differential.

During the years in issue, 1979 through 1980, interest rates were volatile. For example, the yield on 3-month Treasury bills during the last quarter of 1979 was 10 percent. The rates rose to over 15 percent during the second

## T-BOND STRADDLE NO. 1 1979-1981

| | | CONTRACTS: LONG OR (SHORT) | | | | | Current balance long/(short) | CUMULATIVE | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mar. 1981 | Jun. 1981 | Sep. 1981 | Dec. 1981 | Mar. 1982 | | Gain (loss) realized | Unrealized gain (loss) in account | Net equity in account |
| **1979 TRANSACTIONS** | | | | | | | | | | |
| **Initial transaction** 10/11/79 | Trade | (150) | 300 | (150) | | | | | | |
| | Position | (150) | 300 | (150) | | | 300-(300) | N/A | $0 | $0 |
| **First transaction** 10/23/79 | Trade | 150 | (150) | (300) | | | | | | |
| | Position | 150 | (150) | 0 | (150) | 150 | 300-(300) | ($937,000) | 932,812 | (4,688) |
| **Second transaction** 12/28/79 | Trade | | 43 | (43) | | | | | | |
| | Position | 150 | (107) | (43) | (150) | 150 | 300-(300) | (40,312) [1](977,812) | 969,781 | (8,031) |
| **1980 TRANSACTIONS** | | | | | | | | | | |
| **Third transaction** 1/29/80 | Trade | 2 (4) | | 2 | | | | | | |
| | Position | 148 | (107) | (41) | (150) | 150 | 298-(298) | 7,843 7,843 | 926,781 | (43,188) |
| **Fourth transaction** 2/11/80 | Trade | (150) | | 300 | | (150) | | | | |
| | Position | (2) | (107) | 259 | (150) | 0 | 259-(259) | (1,868,093) (1,860,250) | 2,806,246 | (31,814) |

[1]Claimed on 1979 tax return as short-term capital loss.

## T-BOND STRADDLE NO. 1 1979-1981
### (continued)

| | CONTRACTS: LONG OR (SHORT) | | | | | CUMULATIVE | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mar. 1981 | Jun. 1981 | Sep. 1981 | Dec. 1981 | Mar. 1982 | Current balance long/(short) | Gain (loss) realized | Unrealized gain (loss) in account | Net equity in account |
| **1979 Transactions** | | | | | | | | | |
| Fifth transaction 2/12/80 | | | | | | | | | |
| Trade | (2) | (41) | 43 | | | 302-(302) | 0 | $2,807,590 | ($30,470) |
| Position | (4) | (148) | 302 | (150) | 0 | | ($1,860,250) | | |
| Sixth transaction 2/13/80 | | | | | | | | | |
| Trade | 4 | (2) | (2) | | | 300-(300) | (375) | 2,808,033 | (30,407) |
| Position | 0 | (150) | 300 | (150) | 0 | | (1,860,625) | | |
| Seventh transaction 2/14/80 | | | | | | | | | |
| Trade | | | 1 | | | 300-(300) | 187 | 2,807,030 | (31,220) |
| Position | 0 | (150) | (1) 300 | (150) | 0 | | (1,860,438) | | |
| Eighth transaction 11/11/80 | | | | | | | | | |
| Trade | | 75 | (150) | 75 | | 150-(150) | 1,647,656 | 1,180,468 | (10,126) |
| Position | 0 | (75) | 150 | (75) | 0 | | 212,782 | | |
| **1981 Transactions** | | | | | | | | | |
| Ninth transaction 1/6/81 | | | | | | | | | |
| Trade | | 75 | (150) | 75 | 0 | 0-0 | 1,188,500 | N/A | (2,094) |
| Position | 0 | 0 | 0 | 0 | 0 | | [2]1,188,500 | | |

[1] Claimed on 1980 tax return as a long-term capital loss of $332,812 as offset by a short-term capital gain of $120,030 ($332,812 - $120,030 = $212,782).

[2] Claimed on 1981 tax return as a short-term capital gain of $714,156 and a long-term capital gain of $474,344 ($714,156 + $474,344 = $1,188,500).

quarter of 1980, dropped below 8 percent during the third quarter of 1980, rebounded to over 15 percent during 1981 and dropped to approximately 12 percent during the first quarter of 1982.

The prices of nearby futures contracts had similar fluctuations. In mid-1979, the closest maturity T-Bond contract was 92.5 percentage points or $92,500 for $100,000 face amount of bonds. Seven to eight months later, the price had fallen to 63 percentage points, or a loss of close to 30 points, ($30,000) per contract. Between March and June 1980, prices of nearby T-Bond contracts went from 64 to 86 percentage points, and within 6 months fell back to 64 percentage points. T-Bond futures hit a low of nearly 55 percentage points in October 1981, and fluctuated sharply for the next 9 months before rallying in mid-1982. By the fall of 1982, prices rebounded to 79 percentage points.

### D. T-Bond Straddle No. 2

On June 26, 1980, Perlin, on behalf of Hillbrook, initiated T-Bond Straddle No. 2 by establishing a 150-contract T-Bond butterfly straddle. T-Bond Straddle No. 2 is depicted by the table on pages 408-411.

As the table on pages 408-411 indicates, the initial configuration in T-Bond Straddle No. 2 was a perfect butterfly straddle. Although this configuration was later changed into more complicated configurations, throughout the life of the straddle, a balanced position was maintained.

During 1980, switch transactions and day trades[15] in T-Bond Straddle No. 2 were utilized to realize the following capital gains and losses:

| Date | Short-term capital gain or loss | Type of transaction | Table reference |
|------|------|------|------|
| Nov. 11, 1980 | ($1,767,187) | Switch | First transaction |
| Nov. 12, 1980 | 93,750 | Switch | Second transaction |
| Dec. 2, 1980 | (487,719) | Day trade | Third transaction |
| Dec. 9, 1980 | 35,062 | Day trade | Fourth transaction |
| Dec. 12, 1980 | (170,312) | Switch | Fifth transaction |
| Total | (2,296,406) | | |

The overall performance of T-Bond Straddle No. 2 was a loss of $28,500, computed as follows:

---

[15]Discussed *infra.*

| 1980 | Short-term capital loss | ($2,296,406) |
|------|-------------------------|--------------|
| 1981 | Short-term capital loss | (1,876,376) |
| 1982 | Short-term capital gain | 4,144,280 |
| | Overall loss | (28,502) |

The net equity in the straddle based on actual prices during the years in issue ranged from $0 on November 11, 1980, to a negative $9,594 on December 9, 1980. The net equity based on settlement prices ranged from $0 on several dates including June 30, 1980, to a negative $28,344 on December 23, 1980, and varied by as much as $5,000 in a single day.

The same factors affecting the straddle differential in T-Bond Straddle No. 1 also affected the straddle differential in T-Bond Straddle No. 2.

*E. Day Trades*

Day trading occurs when a trader buys or sells an outright or a straddle position at one point during the day, and acquires an offsetting position at a later point during the day, hoping to profit from price movements occurring during the day.

In performing its booking services for some of the clearing firms, the Clearing Corp. has programmed its computer to offset trades on a First-In-First-Out (FIFO) basis, so that the purchase or sale of a commodity futures contract will be matched against the oldest open position. However, with respect to day trades, the computer is programmed to match the purchase and sale on the same day, of commodity futures contracts for the same month, unless special instructions are used.

For example, assume that on June 1, 1985, a trader established an open long position of 20 December 1986 corn futures at a price of $2.56 per bushel and on June 10 he buys another 20 December 1986 corn futures at $2.55 per bushel and he also sells 20 December 1986 corn futures at $2.54 per bushel. The accounting system used by the Clearing Corp. would offset the two June 10 trades against each other so that the realized loss for June 10 would be $0.01 per bushel. Special instructions could be used, how-

## T-BOND STRADDLE NO. 2 1980-1982

1980 Transactions

| | CONTRACTS: LONG OR (SHORT) | | | | | Current balance long/(short) | CUMULATIVE | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sep. 1982 | Dec. 1982 | Mar. 1983 | Jun. 1983 | Sep. 1983 | | Gain (loss) realized | Unrealized gain (loss) in account | Net equity in account |
| **Initial transaction** | | | | | | | | | |
| 6/26/80 | | | | | | | | | |
| Trade | 150 | | | | | | | | |
| Position | 150 | | | | | 300-(300) | N/A | ($4,688) | ($4,688) |
| **First transaction** | | | | | | | | | |
| 11/11/80 | | | | | | | | | |
| Trade | (150) | (300) | 150 | | | | | | |
| Position | 0 | (300) | 300 | | | 300-(300) | ($1,767,187) | 1,767,187 | 0 |
| **Second transaction** | | | | | | | | | |
| 11/12/80 | | | | | | | | | |
| Trade | 150 | | (150) | | | | 93,750 | | |
| Position | 150 | (300) | 150 | | | 300-(300) | (1,673,437) | 1,664,062 | (9,375) |
| **Third transaction** | | | | | | | | | |
| 12/2/80 | | | | | | | | | |
| Trade | | 24 (24) | (48) 48 | 24 (24) | | | (487,719) | | |
| Position | 150 | (300) | 150 | 0 | | 300-(300) | (2,161,156) | 2,151,566 | (9,594) |
| **Fourth transaction** | | | | | | | | | |
| 12/9/80 | | | | | | | | | |
| Trade | | 102 (102) | (102) 102 | | | | 35,062 | | |
| Position | 150 | (300) | 150 | 0 | | 300-(300) | (2,126,094) | 2,116,500 | (9,594) |

## T-BOND STRADDLE NO. 2 1980-1982
### (continued)

| | CONTRACTS: LONG OR (SHORT) | | | | | Current balance long/(short) | CUMULATIVE | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sep. 1982 | Dec. 1982 | Mar. 1983 | Jun. 1983 | Sep. 1983 | | Gain (loss) realized | Unrealized gain (loss) in account | Net equity in account |
| **Fifth transaction** 12/12/80 | | | | | | | | | |
| Trade | | | (50) | 50 | | | | | |
| Position | 150 | (300) | 100 | 50 | | 300-(300) | ($170,312) / (2,296,406) | $2,288,368 | ($8,032) |
| | | | 1981 TRANSACTIONS | | | | | | |
| **Sixth transaction** 1/13/81 | | | | | | | | | |
| Trade | | | 150 | (300) | 150 | | | | |
| Position | 150 | (300) | 250 | (250) | 150 | 550-(550) | 151,562 / 151,562 | 2,125,090 | (19,750) |
| **Seventh transaction** 1/15/81 | | | | | | | | | |
| Trade | | | 50 | (50) | | | | | |
| Position | 150 | (300) | 300 | (300) | 150 | 600-(600) | N/A / 151,562 | 2,125,090 | (19,750) |
| **Eighth transaction** 2/11/81 | | | | | | | | | |
| Trade | 150 (150) | | 300 (300) | | (150) 150 | | | | |
| Position | 150 | (300) | 300 | (300) | 150 | 600-(600) | (1,993,156) / (1,841,594) | 1,971,846 | (21,314) |
| **Ninth transaction** 8/5-6/81 | | | | | | | | | |
| Trade | 150 (150) | | (300) 300 | | 150 (150) | | | | |
| Position | 150 | (300) | 300 | (300) | 150 | 600-(600) | (2,912,469) / (4,754,063) | 2,880,688 | (31,782) |

[1] Claimed on 1980 tax return as short-term capital loss.

## T-BOND STRADDLE NO. 2 1980-1982
### (continued)

| | CONTRACTS: LONG OR (SHORT) | | | | | Current balance long/(short) | CUMULATIVE | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sep. 1982 | Dec. 1982 | Mar. 1983 | Jun. 1983 | Sep. 1983 | | Gain (loss) realized | Unrealized gain (loss) in account | Net equity in account |
| **Tenth transaction** 11/20/80 | | | | | | | | | |
| Trade | | | (144) | 288 | (144) | | $2,372,063 | | |
| Position | 150 | (300) | 156 | (12) | 6 | 312-(312) | (2,382,000) | $4,655,994 | ($22,406) |
| **Eleventh transaction** 11/23/81 | | | | | | | | | |
| Trade | | | (6) | 12 | (6) | | 96,937 | | |
| Position | 150 | (300) | 150 | 0 | 0 | 300-(300) | (2,285,063) | 4,559,055 | (22,405) |
| **Twelfth transaction** 11/30/81 | | | | | | | | | |
| Trade | (11) | 22 | (11) | | | | 406,656 | | |
| Position | 139 | (278) | 139 | 0 | 0 | 278-(278) | (1,878,407) | 4,152,406 | (22,404) |
| **Thirteenth transaction** 12/8/81 | | | | | | | | | |
| Trade | 5 (5) | | | | | | 2,031 | | |
| Position | 139 | (278) | 139 | 0 | 0 | 278-(278) | [1](1,876,376) | 4,131,252 | (41,528) |
| **1982 TRANSACTIONS** | | | | | | | | | |
| **Fourteenth transaction** 3/5/82 | | | | | | | | | |
| Trade | (25) | 50 | (25) | | | | 924,219 | | |
| Position | 114 | (228) | 114 | 0 | 0 | 228-(228) | 924,219 | 3,220,064 | (28,496) |

[1]Claimed on 1981 tax return as short-term capital loss.

## T-BOND STRADDLE NO. 2 1980-1982
### (continued)

| | Contracts: Long or (Short) | | | | | Current balance long/(short) | Cumulative | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sep. 1982 | Dec. 1982 | Mar. 1983 | Jun. 1983 | Sep. 1983 | | Gain (loss) realized | Unrealized gain (loss) in account | Net equity in account |
| **Fifteenth transaction** | | | | | | | | | |
| 3/23/82 | | | | | | | | | |
| Trade | (57) | 114 | (57) | | | | | | |
| Position | 57 | (114) | (57) | 0 | 0 | 114-(114) | $2,107,218 (3,031,437) | $1,112,846 | ($28,494) |
| **Sixteenth transaction** | | | | | | | | | |
| 3/24/82 | | | | | | | | | |
| Trade | (57) | 114 | (57) | | | | | | |
| Position | 0 | 0 | 0 | 0 | 0 | 0-0 | 1,112,843 ¹4,144,280 | N/A | (28,494) |

¹Claimed on 1982 tax return as short-term capital gain.

ever, to prevent the offset of the two June 10 trades. The computer would then revert to a FIFO basis in which case the realized loss would be increased to $0.02 per bushel.

Perlin used special instructions to prevent the accounting system from offsetting day trades in the Soybean Straddle on December 13 and 28, 1979, and in T-Bond Straddle No. 2 on December 2, 9, and 12, 1980. At the end of the trading day for each of these trades, petitioners' straddle position was the same as their position at the beginning of the trading day. The following chart shows the realized gains and losses as a result of using the special instructions as well as the results if the special instructions had not been requested:

| Straddle | Date | Claimed short-term capital gain/(loss) using special instructions | Short-term capital gain/(loss) without using special instructions |
|---|---|---|---|
| Soybean | Dec. 13, 1979 | $1,763 | $1,763 |
| | | (96,350) | (2,350) |
| Soybean | Dec. 28, 1979 | (30,000) | (500) |
| T-Bond No. 2 | Dec. 2, 1980 | (219) | (219) |
| | | (487,500) | 0 |
| T-Bond No. 2 | Dec. 9, 1980 | 981,750 | 0 |
| | | (946,688) | 0 |

## Transaction Costs

A professional trader encounters three types of transaction costs. First, he pays commissions to his clearing firm. These commissions are "roundturn" fees which are charged only when a contract is offset. For example, if a trader establishes an open position of one long silver contract on March 1, 1985, which he offsets on March 3, 1985, the roundturn commission will be charged only on March 3, 1985. The commissions generally are less than $1 per trade roundturn or $0.50 per contract traded. Second, a trader pays an exchange fee to reimburse his clearing firm for the clearing fee charged the clearing firm by the Clearing Corp. This fee is minimal and usually ranges between $0.02 and $0.04 per trade. Third, if a trader uses a floor broker to execute a trade for him, the trader must pay the floor broker a brokerage fee for executing the trade. This is not a roundturn fee, is charged on each contract that is bought or

sold, and typically ranges between $0.50 and $2 for each contract filled by the broker. The total transaction costs for a professional trader are usually less than one tick, the minimum price movement on a futures contract.[16]

An investor generally pays substantially higher transaction costs than a professional trader. The transaction costs paid by an investor range between $10 and $90 per contract.

During the years in issue, Perlin and Hillbrook cleared their trades through Eisen and Blum (E & B), a member clearing firm at the CBOT. E & B agreed with Perlin and Hillbrook that the charge for commissions would be $1.50 for each futures contract cleared by E & B. However, both Perlin and Hillbrook had a "cap" on the amount of commission charged so that after Perlin or Hillbrook had paid a certain amount in commissions, for example $25,000, additional trades would be cleared without additional charge; although once Perlin or Hillbrook reached the cap they would continue to pay a small exchange fee to E & B to reimburse E & B for its costs of clearing the trades through the Clearing Corp. This fee was between 2 and 4 cents per trade.

Because the fee arrangement was structured in such a manner, it is appropriate to use an average figure to determine the commission and exchange fees for each of the straddles, rather than use the actual fees paid on each trade.

In 1978, Perlin paid exchange fees and commissions of $141.20 and traded 329 contracts for an average cost for commissions and exchange fees of $0.43 per contract roundturn on all his trading. Likewise, for 1978, Hillbrook paid $24,638 in exchange fees and commissions and traded 32,405 contracts for an average cost for exchange fees and commissions of $0.76 per contract roundturn. In 1979, Hillbrook paid $24,286 in exchange fees and commissions and traded 95,377 contracts for an average cost for exchange fees and commissions of $0.25 per contract roundturn. In 1980, Hillbrook paid $67,044 in exchange fees and commissions and traded 154,672 contracts for an

---

[16]One tick in the value of a silver futures contract is $5. One tick for a soybean futures contract is $12.50. One tick for a T-Bond futures contract is $31.25.

average cost of exchange fees and commissions of $0.43 per contract roundturn.

The total exchange fees and commissions for the straddles in issue are shown by the following table:

| Straddle | No. of contracts[1] | No. of roundturn trades[2] | Average cost of exchange fees and commissions per contract $\times$ roundturn[3] | Total exchange fees and $=$ commissions |
|---|---|---|---|---|
| Silver | 3,046 | 1,523 | 0.43 | $654.89 |
| Soybean | 548 | 274 | 0.25 | 68.50 |
| T-Bond No. 1 | 2,590 | 1,295 | 0.43 | 556.85 |
| T-Bond No. 2 | 2,500 | 1,250 | 0.43 | 537.50 |

[1]Because the trades occurring in 1981 are not in issue (see note 6 *supra*), these figures include only those contracts traded through and including 1980. The number of contracts for T-Bond Straddle No. 1, however, was calculated by taking the total number of Treasury Bond contracts traded in the straddle through Dec. 31, 1980 (2,290), and adding to that number an additional 300 contracts which would have been necessary to fully offset the contracts existing in the straddle on Dec. 31, 1980. Similarly, 600 contracts were added to the total number of contracts traded through Dec. 31, 1980 (1,900), in T-Bond Straddle No. 2, to reflect the number of contracts necessary to fully offset the contracts existing in that straddle on Dec. 31, 1980.

[2]These figures are derived by dividing the total number of contracts by two, to reflect that the commissions and exchange fees are charged on a roundturn basis. See note 1 for the explanation of the use of post-1980 transactions.

[3]In making these calculations, the figures for the average commissions and exchange fees for all of petitioners' trades (including trades involving outright positions) were used for the year that the straddle was primarily maintained. Thus, if a straddle was maintained over a small part of 1979, all of 1980, and a small part of 1981, the average cost for 1980 was used to determine the appropriate average cost figure.

Accordingly, the total transaction costs for each of the straddles was as follows:

| Straddle | Brokerage fees | $+$ | Exchange fees and commissions | $=$ | Total |
|---|---|---|---|---|---|
| Silver | $886.50 | | $654.89 | | $1,541.39 |
| Soybean | 731.10 | | 68.50 | | 799.60 |
| T-Bond No. 1 | 3,117.00 | | 556.85 | | 3,673.85 |
| T-Bond No. 2 | 1,436.25 | | 537.50 | | 1,973.75 |

## OPINION

I. The first issue for decision is whether petitioners' investments in certain commodity straddles for the taxable year ending December 31, 1980, were sham transactions, devoid of the requisite economic substance.

Respondent contends that certain trades executed in T-Bond Straddle No. 1 on November 11, 1980, and in T-Bond Straddle No. 2 on November 11, 1980, December 9, 1980, and December 12, 1980, were actually prearranged in a noncompetitive manner. As such, according to respondent, the transactions were factual shams, executed in violation of the Commodity Futures Trading Commission (CFTC) regulations and should not be recognized for Federal tax purposes.[17] Petitioners understandably contend otherwise. In support of their contention, petitioners argue that the trades were in fact executed by competitive open-outcry bidding in accordance with the CFTC regulations and had valid tax consequences.

Alleged transactions involving commodity futures contracts which are in fact prearranged or fictitious will not be recognized for Federal tax purposes. See *Brown v. Commissioner*, 85 T.C. 968 (1985); *Forseth v. Commissioner*, 85 T.C. 127 (1985); *Miller v. Commissioner*, 84 T.C. 827 (1985), on appeal (10th Cir., Nov. 20, 1985); *Julien v. Commissioner*, 82 T.C. 492 (1984). Respondent's determination that the underlying transactions are not bona fide is presumptively correct; and petitioners have the burden of proving otherwise. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); Rule 142(a).

The CFTC regulations contain similar restrictions. The regulations prohibit fictitious and prearranged trading at the CBOT and provide that, with limited exceptions,[18] all trading must be executed by competitive open-outcry bidding or by another equally open and competitive method. 17 C.F.R. sec. 1.38(a) (1980). Competitive open-outcry bidding occurs when traders execute their trades through a combi-

---

[17]Respondent's allegations are somewhat similar to those described in *United States v. Winograd*, 656 F.2d 279, 281 (7th Cir. 1981), cert. denied sub nom. *Siegel v. United States*, 455 U.S. 989 (1982), affg. defendants' conviction under sec. 7206(2) of conspiring to impair the collection of income taxes by claiming losses on tax straddles in futures contracts in Mexican pesos which were not entered into through bona fide trades or open bids on an established market, but instead were prearranged uncompetitive trades done between various employees of one of the principals involved. See also *Sundheimer v. Commodity Futures Trading Commission*, 688 F.2d 150 (2d Cir. 1982), cert. denied 460 U.S. 1022 (1983); *United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980), cert. denied 449 U.S. 1077 (1981); *United States v. Siegel*, 472 F. Supp. 440 (N.D. Ill. 1979).

[18]Noncompetitive trades are allowed in some situations only if they are approved by the CFTC. See 17 C.F.R. sec. 1.38 (1980). However, no such trades were involved in the instant matter.

nation of both loud verbal communication and ritualistic hand signals. Because the trades are executed by open outcry, everyone trading in that particular trading pit is supposed to have the opportunity to take the trade.

A careful review of the circumstances surrounding each trade leads us to the inescapable conclusion that petitioners have established that the transactions involved were in fact bona fide and not prearranged or fictitious. All of the trades cleared through the normal clearing process of the Clearing Corp. and were reported on the customary business records maintained by Perlin's clearing firm, E & B, and supplied to petitioners after each trading day. Moreover, petitioners had nothing to gain by arranging the trades in advance since the record suggests that at the time of these trades the price and quantity of the contracts involved could have been obtained on the open market.

With this in mind, we now turn to the arguments raised by respondent. For purposes of convenience we will discuss each trade date separately.

November 11, 1980—Perlin and Vose's trading cards reflect that a 57-contract straddle and a 150-contract straddle were traded between them on this date for T-Bond Straddle Nos. 1 and 2, respectively.

In arguing that the above trades were fictitious, respondent relies primarily on the testimony of Pemberton Shober (Shober), a trader and member of the T-Bond Pit Committee.[19] Shober testified that he was trading straddles in the straddle area of the T-Bond pit on November 11, 1980, and that he did not see Perlin execute either of these trades by open outcry. He stated that he would have remembered if Perlin had executed the trades in such a manner because Perlin did not normally trade straddles.

We find this testimony to be unreliable for several reasons. Based on the estimates of traders who testified at trial, there were approximately 10 to 25 traders trading straddles in the T-Bond pit during 1980. This estimate, coupled with the huge volume of trading occurring during this period,[20] convinces us that it is unlikely that a trader

---

[19]The Pit Committee is responsible for reporting violations of the CFTC regulations.

[20]Vose, for example, testified that his trading records indicated that he traded at least 100,000 contracts during 1979, 1980, and 1981.

would remember the specifics of a trade occurring nearly 4 years before the trial. Vose testified that he could not remember these trades, and Shober testified that he could not remember any of the trades he made on that day. More importantly, although Shober testified he would have remembered any trades made by Perlin, it is interesting to note that Shober also stated that he did not even know what Perlin looked like.[21] Thus, it would have been a difficult task, indeed, for him to remember whether Perlin had executed the trades by open outcry. Shober also indicated that he never saw Perlin trade in the straddle area of the T-Bond pit during 1980, yet it is undisputed that during this period Perlin executed trades in T-Bond straddles with at least eight traders other than Vose. For these reasons we believe that the trades occurring in T-Bond Straddle No. 2 on November 11, 1980, were not prearranged or fictitious, but were in fact bona fide.

December 9, 1980—Perlin and Vose's trading cards reflect that on this date Perlin sold a 102-contract straddle to Luttrell and that Perlin bought a 102-contract straddle from Vose. Luttrell's trading card, however, indicates that Luttrell executed the 102-contract straddle directly with Vose.

Respondent contends that what actually happened was that after the Vose/Luttrell trades were executed, Vose and Perlin filled out their own trading cards to make it appear that Perlin was in the middle of the Vose/Luttrell trades.

Luttrell at first testified that it was unlikely that he made a mistake in writing down Vose rather than Perlin as the opposite trader on the trading card, and that in all likelihood he executed the 102-contract straddle directly with Vose. However, neither Luttrell or Vose could remember executing this particular T-Bond straddle trade with

---

[21] In this regard, Shober testified as follows:

Question: Have you ever heard of Paul Perlin?

Answer: I've heard of him. I've never met him or spoken to him, or ever traded with him, and he was pointed out to me once, I think in the trading pit, but I still don't know what he looks like.

           \*      \*      \*      \*      \*      \*      \*

Question: You were asked about knowing Mr. Perlin, and did I understand you to say that you didn't know what he looked like?

Answer: No, I don't. He was pointed out to me once two or three years ago.

Question: But you don't know what he looks like?

Answer: No, that's correct.

Perlin. In fact, both Luttrell and Perlin's trade registers[22] reflect that Luttrell made the trade with Perlin, not with Vose on behalf of Perlin. After he became aware that the trade cleared with Perlin, Luttrell testified that it was just as likely as not that he made a mistake[23] in writing on the card. In light of the foregoing testimony, we conclude that the December 9, 1980, trade was not prearranged or fictitious.

December 12, 1980—Perlin and Vose's trading cards reflect that a 50-contract T-Bond straddle was executed by them on this date for T-Bond Straddle No. 2.

Respondent argues that Perlin normally executed trades for T-Bond Straddle Nos. 1 and 2 by using Vose as his broker. Nonetheless, every time Perlin purportedly executed a T-Bond straddle trade for himself, Vose took the other side for his own account, despite the fact that there were anywhere between 10 and 25 other traders in the T-Bond pit who could have taken the trade during the time this trade was executed. Respondent contends that this fact, in addition to the fact that no T-Bond straddle trader could ever recall seeing Perlin trade a T-Bond straddle by open outcry, confirms that this trade (as well as the trades on the two previously mentioned dates) were prearranged.

Respondent's argument is erroneous in several respects. As to the first part of respondent's argument, the record shows that Vose did not always take the opposing side when Perlin traded for his own account. Although Vose was the opposing broker in 78 percent of the trades executed by Perlin for T-Bond Straddle No. 2, Vose was the opposing broker for only 20 percent of the trades executed by Perlin for T-Bond Straddle No. 1.[24] Moreover, Perlin testified that the reason he traded with Vose was because Vose was an experienced trader whom he could count on to give him a fair market price. We realize that this statement is somewhat self-serving. However, we are not convinced that the frequency of the Perlin/Vose trades is indicative of prearrangement. It is also noteworthy that respondent does not

---

[22]See note 11 *supra*.

[23]Mistakes in writing trading cards were not an uncommon occurrence. All five of the traders (including Perlin) who testified on this subject indicated that errors occurred frequently.

[24]See note 10 *supra*.

assert that there was anything about the terms of the straddles (price, quantity, etc.) that would suggest that they were in any way unusual.

The second part of respondent's argument is also unconvincing. The brokers who testified stated to the effect that they could not recall whether Perlin had traded T-Bond straddles during 1980, *not* whether or not he had traded T-Bond straddles by open outcry.

In sum, we conclude that the transactions involved herein were in fact bona fide and not prearranged shams.[25] Since these transactions have survived the threshold issue of economic substance, they now qualify for discussion under the second issue.

II. The second issue for decision is whether petitioners' investments in the commodity straddle transactions for the taxable years ending December 31, 1978, through December 31, 1980, satisfied the entered into for profit requirement of section 108 of the act.

Section 108(a) of the act provides that a loss from the disposition of a position entered into before 1982 is allowable if: (1) The position forms part of a straddle, (2) the amendments made by title V of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 323 (the 1981 act ) (relating to the mark-to-market provisions), do not apply to the position, and (3) the position is part of a transaction entered into for profit. The parties are in agreement that the first two requirements have been satisfied; the controversy therefore centers on whether the straddles in issue were transactions entered into for profit.

Section 108(b) of the act provides:

For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit. [98 Stat. 630]

When interpreting a statute, and especially a new statute, a court may look to legislative history for interpretative assistance. *Miller v. Commissioner*, 84 T.C. at 838 n. 20; *J.C. Penney Co. v. Commissioner*, 37 T.C. 1013, 1016-1017

[25]Respondent made similar allegations with respect to trades occurring on Jan. 15, 1981, and Feb. 11, 1981. We do not find it necessary to rule on the validity of these trades, because petitioners' 1981 tax year is not in issue.

(1962), affd. 312 F.2d 65 (2d Cir. 1962). See also *Huntsberry v. Commissioner*, 83 T.C. 742, 747-748 (1984). Section 108 of the act had no precise counterpart either in the House or the Senate versions of the bill; the only legislative history available is the Conference Committee report, which in pertinent part reads as follows:

In the case of commodity dealers and persons actively engaged in investing in RFCs, the provision is to be applied by presuming that the position is held as part of a transaction entered into for profit unless the Internal Revenue Service establishes to the contrary. In determining whether a taxpayer is actively engaged in trading in RFCs with an intent to make a profit, a significant factor will be the extent of transaction costs. If they are sufficiently high relatively [sic] to the scope of the taxpayer's activities that there is no reasonable possibility of a profit, the presumption will be unavailable. RFCs for purposes of applying the presumption are regulated futures contracts as defined in section 1256(b) before its amendment by the bill.

For purposes of the provision, the term "commodities dealer" has the same meaning as such term in the amendments by the bill providing for application [of] the self-employment income tax to such persons.

[H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 2) 1, 171 (the Committee report).]

The provisions of respondent's temporary regulations relevant to the presumption in section 108 of the act provide:

Q-5. Under what circumstances is the presumption considered rebutted?

A-5. All the facts and circumstances of each case are to be considered in determining if the presumption is rebutted. The following factors are significant in making this determination: (1) the level of transaction costs; (2) the extent to which the transaction results from trading patterns different from the taxpayer's regular patterns; and (3) the extent of straddle transactions having tax results disproportionate to economic consequences. Factors other than the ones described above may be taken into account in making the determination. Moreover, a determination is not to be made solely on the basis of the number of factors indicating that the presumption is rebutted.

Q-6. Does a commodities dealer or person regularly engaged in investing in regulated futures contracts qualify for the profit presumption for all transactions?

A-6. No. The presumption is only applicable to regulated futures contract transactions in property that is the subject of the person's regular trading activity. For example, a commodities dealer who regularly trades only in agricultural futures will not qualify for the presumption for a silver futures straddle transaction. For purposes of this section, the

term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Code as in effect before the enactment of the Tax Reform Act of 1984.

[Sec. 1.165-13T, Temporary Income Tax Regs. T.D. 7968, 49 Fed. Reg. 33444 (Aug. 21, 1984).]

The parties do not dispute that Perlin and Hillbrook were commodities dealers or persons regularly engaged in investing in regulated futures contracts. They disagree, however, as to the validity and effect of the above-quoted regulations.

The appropriate standards to be applied when testing the validity of a regulation are as follows:[26]

The Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a); *United States v. Correll*, 389 U.S. 299, 306-307 (1967). Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). Regulations, as constructions of the Code by those charged with its administration, "should not be overruled except for weighty reasons." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969); *Commissioner v. South Texas Lumber Co., supra* at 501.

Although regulations are entitled to considerable weight, "respondent may not usurp the authority of Congress by adding restrictions to a statute which are not there." *Estate of Boeshore v. Commissioner*, 78 T.C. 523, 527 (1982). See *State of Washington v. Commissioner*, 77 T.C. 656 (1981), affd. 692 F.2d 128 (D.C. Cir. 1982). A regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language, origin, and purpose of the statute. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982); *Durbin Paper Stock Co. v. Commissioner*, 80 T.C. 252, 257 (1983).

[*Miller v. Commissioner, supra* at 841 (quoting *Stephenson Trust v. Commissioner*, 81 T.C. 283 at 287-288 (1983)).]

In *Miller*, we held invalid Q & A-2 of the same temporary regulations involved here, without deciding the validity of Q & A-5 and Q & A-6. In so holding we stated:

It is worth noting that these regulations were issued as temporary regulations because of the "need for immediate guidance." That need obviously involved a number of pending cases, including this one, where respondent was engaged in litigation over straddle losses. There is at least some question whether a regulation issued to buttress respondent's

---

[26]Here, as in *Miller v. Commissioner*, 84 T.C. at 841 n. 26, and *Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283 (1983), the regulations were issued pursuant to respondent's general interpretative power and as such are to be accorded less weight than legislative regulations. *Estate of Boeshore v. Commissioner*, 78 T.C. 523, 527 n. 5 (1982). See sec. 7805.

litigating position is entitled to any special presumption of validity. See, e.g., *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971). [84 T.C. at 841-842]

With these principles in mind we must now examine the specific regulations involved here, viz, Q & A-5 and Q & A-6 of section 1.165-13T, Temporary Income Tax Regs.

Petitioners contend that Q & A-6 improperly restricts the availability of the presumption. They argue that the regulation, which limits the availability of the presumption to transactions which are the subject of the trader's regular trading activity, is contrary to the clear intent of section 108(b) of the act which states that the presumption applies to "*any* position held by a commodities dealer."[27] (Emphasis added.) As such, petitioners argue that the regulation must be invalidated in accordance with the following language in *CWT Farms, Inc. v. Commissioner*, 79 T.C. 1054, at 1062 (1982), affd. 755 F.2d 790 (11th Cir. 1985):

where the statute is unambiguous, and there is no valid reason for adding a requirement to those the statute already provides, the commissioner may not usurp congressional authority by adding such a requirement by regulation. [Citation omitted.]

Respondent contends that a review of legislative history of section 108 of the act requires us to uphold the regulation. Respondent relies on the following language in the committee report:

For purposes of the provision, the term "commodities dealer" has the same meaning as such term in the amendments by the bill providing for application [of] the self-employment income tax to such persons. [98 Stat. 630]

Respondent argues that the above-quoted language makes it clear that Congress intended the presumption to apply in a manner consistent with the application of section 102(c)(1) of the act. Section 102(c)(1) of the act provides that gain or loss of a commodities dealer is included as "net earnings from self-employment" only if it is "gain or loss (in the *normal course of the taxpayer's activity* of dealing in or

---

[27]Sec. 108(e) of the act states that the term "straddle" has the meaning provided in sec. 1092(c) as in effect after the enactment of the 1981 Act. Sec. 1092(c)(1) defines "straddle" as "offsetting positions with respect to personal property." For this purpose, "position" is defined by sec. 1092(d)(2)(A), as in effect after the enactment of the 1981 Act, as "an interest (including a futures or forward contract or option) in personal property."

trading section 1256 contracts) from section 1256 contracts or property related to such contracts." (Emphasis added.) Respondent argues that the emphasized language provides authority for the regular trading activity limitation imposed by Q & A-6.

We believe that respondent's position is incorrect. We agree that the committee report requires us to look to section 102(c)(1) of the act; however, the committee report indicates that we are to refer to that section only to determine the meaning of the term "commodities dealer." Section 102(c)(1) of the act goes on to state "The term 'commodities dealer' means a person who is actively engaged in trading section 1256 contracts and is registered with a domestic board of trade which is designated as a contract market by the Commodity Futures Trading Commission." The additional limitation imposed by respondent simply does not appear in the definition.

We think that there is merit to petitioners' position, since the statute literally applies to *any* position held by a commodities dealer. Nevertheless, we do not deem it necessary to invalidate this portion of the regulation since Perlin's regular trading activity was broad enough to include the straddle transactions involved herein. On the basis of the record we are satisfied that Perlin was primarily a scalper,[28] but as our findings show, he also traded a significant number of contracts in the straddle accounts and maintained positions in the accounts for substantial time periods.[29] Thus we believe that petitioners

---

[28]Scalping occurs when a trader buys or sells an outright position at one price and tries to quickly offset it at a small increment (a tick) of appreciation. Through use of this technique the trader hopes to profit due to the large number of contracts traded. A sample of daily trading activity for Perlin for the first trading day of each month during 1980 shows that on the average, Perlin traded approximately 351 outright positions per day.

[29]The record reveals that approximately 7,784 contracts were traded in the straddle accounts during the years in issue. The straddles were maintained over the following time periods:

| Straddle | Established | Liquidated |
| --- | --- | --- |
| Silver | Apr. 13, 1978 | Jan. 10, 1979 |
| Soybean | July 31, 1979 | Feb. 11, 1980 |
| T-Bond No. 1 | Oct. 11, 1979 | Jan. 6, 1981 |
| T-Bond No. 2 | June 26, 1980 | Mar. 24, 1982 |

have complied with the requirements of Q & A-6 of section 1.165-13T, Temporary Income Tax Regs.[30]

With respect to Q & A-5, petitioners' contend that this portion of the regulation establishes invalid criteria for rebuttal of the presumption.

Factor (1)—Transaction costs.

Petitioners agree that this factor is relevant; however, they feel that in light of the legislative history of section 108 of the act, the transaction costs are only relevant to rebut the presumption if the costs are so high that there is no reasonable possibility of a profit.

Respondent apparently argues that we should look merely to the level of the transaction costs and that the limitation imposed by petitioners is not necessary.

Section 108(b) of the act does not provide us with any indication as to what factors may be used to rebut the presumption. The only guidance we have is the committee report wherein it was stated that a significant factor for determining the availability of the presumption is the extent of transaction costs and "If they are sufficiently high relatively [sic] to the scope of the taxpayer's activities that there is no reasonable possibility of a profit, the presumption will be unavailable." H. Rept. 98-861, *supra* at 171. The origin and the purpose of the statute, as exemplified by the above-quoted portion of the committee report,[31] convinces us that showing that the expected transaction costs are so high that there is no reasonable possibility of any profit is a useful factor in determining whether the presumption has been rebutted.

We do not believe that petitioner's expected transaction costs here precluded any reasonable possibility of profit. The transaction costs petitioners could expect to pay here

---

[30]Respondent also apparently argues that pursuant to *Biedenharn Realty Co., v. United States*, 526 F.2d 409 (5th Cir. 1976), cert. denied 429 U.S. 819 (1976); *United States v. Winthrop*, 417 F.2d 905 (5th Cir. 1969); *Smith v. Dunn*, 224 F.2d 353 (5th Cir. 1955); and *Brown v. United States*, 192 Ct. Cl. 203, 426 F.2d 355 (1970), petitioners' straddle trading is separable and should not be considered part of petitioners' regular trading activity. We find no merit in this argument and feel that the presumption is available here for the reasons enumerated in the text.

[31]Although the committee report speaks in terms of *availability* of the presumption rather than in terms of factors to be used in *rebutting* the presumption, we feel that the level of transaction costs is an important factor to be used in determining whether the presumption may be rebutted since presumably a trader would not normally enter into a transaction where his transaction costs prevented any reasonable possibility of profit.

were minimal. For example, the total transaction costs typically paid by a trader, even if he traded through a broker (which was certainly not the norm for Perlin) ranged from approximately $1 to $3 per contract traded. These costs are insignificant in comparison with what an investor would pay (typically $10 to $90 per contract) but, more importantly, the costs are usually less than one tick, the minimum price increment for a futures contract. It follows that if the straddle position merely increased by one tick the transaction costs would be covered. As is illustrated by our findings, the market conditions and interest rates, which are the primary factors affecting the straddle differential, were fairly volatile during the period in which the straddles were maintained, thus suggesting that a one tick movement was not an unlikely result. We are accordingly of the opinion that the expected transaction costs in the instant matter were not prohibitively high, so as to prevent any reasonable possibility of profit.

Our conclusion concerning transaction costs is corroborated by the following table, which compares the actual transaction costs[32] incurred to the range in straddle differentials:

| Straddle | Actual transaction costs | Range in net equity based on actual prices | Range in net equity based on settlement prices |
|---|---|---|---|
| Silver | $1,541.39 | $12,457 | $75,230 |
| Soybean | 799.60 | 4,100 | 10,025 |
| T-Bond No. 1 | 3,673.85 | 43,188 | 53,907 |
| T-Bond No. 2 | 1,973.75 | 9,594 | 28,344 |

---

[32]When investing in futures contracts, investors or traders must generally buy at the offer price and sell at the bid price. Traders or investors, however, are said to "get the edge" whenever they buy at the bid price or sell at the offer price. A market order occurs when a trader or investor requests a broker to obtain the best price he can but to fill the order as fast as he can. Because the customer has requested the broker to fill the order quickly, the broker may have to give up the edge (i.e., buy at the offer or sell at the bid). According to respondent, giving up the edge is a "friction cost" and should be included in the transaction costs. Respondent argues that Perlin often gave up the edge by placing market orders and thereby incurred additional costs.

We are of the opinion that the so-called friction cost is not a transaction cost, but rather, is part of the price of the underlying futures contract. It cannot be considered a fixed or predetermined expense, because it varies depending on fluctuations in the market price. An anomaly would be created if we were to hold otherwise, because if a trader was able to get the edge, the friction cost would be negative. Moreover, even if we were to agree with respondent, the record convinces us that Perlin did not customarily place market orders and we have not been provided with any accurate estimates of the friction costs involved herein.

The table shows that whether the straddle differential (which provides a measure of profit potential) was based on actual prices or settlement prices, it was always sufficient to cover[33] the transaction costs. Thus, it cannot be said that the actual transaction costs were so high that there was no reasonable possibility of profit.

Factor (2)—The extent to which the transaction results from trading patterns different from the taxpayer's regular trading patterns.

Petitioners contend that this factor is irrelevant. In support of this contention petitioners argue that members of the CBOT, such as Perlin, are entitled to trade any futures contract listed on the CBOT and many traders trade a number of different commodities, using different strategies and techniques with each commodity. Thus, the regular trading pattern becomes an elusive concept. Additionally, the argument follows, this factor is not a reliable indicator of the prospects of profit on any one transaction.

Respondent, on the other hand, argues that this factor is nothing more than a consistent extension of the principles articulated in Q & A-6.

We feel that a trader's regular trading pattern is not an extremely reliable indicator of whether a particular transaction was entered into for profit. We agree with petitioners that determining a trader's regular trading pattern is a difficult task, particularly for a trader such as Perlin, who utilized many different trading techniques and traded in a variety of different commodities. However, we do not feel that it is necessary to invalidate this aspect of the regulation. Though the meaning of "regular trading pattern" is far from clear, we are certain that the term encompassed the straddle transactions involved herein. As we noted when discussing Q & A-6, our findings show that

---

[33]We realize that the net equities involved herein were primarily negative. However, commodity futures trading is referred to as a "zero sum game" which means that for every person who profits on a trade, there is a person who loses on the trade. For example, if one buys a soybean contract (the long) and his position appreciates $10, the seller of the contract (the short) loses $10. Therefore it does not matter whether the net equity is positive or negative, since every loss (negative net equity) measures a price movement that would have produced an equal gain (positive net equity) if the investor/trader had taken the other side. Whether or not the investor/trader actually has gain depends on which side of the transaction he takes, but the potential amount of the gain is the same as the potential amount of the loss. As a result, the potential amount of gain in any straddle transaction is reflected in the amount of net equity, positive or negative, during the course of the transaction.

Perlin traded a significant number of contracts in the straddle accounts and maintained positions in the accounts for substantial time periods. Thus, the use of this factor has not been helpful in rebutting the presumption in the instant matter.

Factor (3)—The extent of straddle transactions having tax results disproportionate to economic consequences.

Petitioners argue that this factor is fundamentally incompatible with both the nature of straddles and the essential purpose of section 108 of the act, because virtually all straddle transactions have potential tax results that respondent considers disproportionate to their economic consequences.

Respondent contends that the third factor is nothing more than a consistent adaptation of the "primary" profit motive standard of section 108 of the act.[34]

At the outset we note that the meaning of "economic consequences" is somewhat unclear. Apparently, in applying this factor, we are to compare the capital gains and losses realized in the straddles with the net overall effect when the gains and losses are offset against one another. This analysis yields the table on page 428 for the straddle transactions involved herein.

As the table on page 428 indicates, the realized capital gains and losses, when compared to the net results of the straddles over the entire period appear to be disproportionate. The table also shows that petitioners were able to realize losses initially while deferring realization of gains until later years.

We do not believe, however, that this factor is relevant for purposes of rebutting the presumption. Neither the language in the statute nor the legislative history even remotely suggests that this disproportionate test has any applicability here. Moreover, the origin and purpose behind section 108(b) of the act was to grant relief to persons who frequently trade in commodity markets. If we were to hold that this factor was significant, then use of the presumption for straddle transactions would be virtually eliminated (a

---

[34]Respondent has apparently ignored our decision in *Miller v. Commissioner*, 84 T.C. at 842, where we held that sec. 108 of the act establishes a reasonable prospect of any profit standard rather than the primary profit standard urged by respondent.

OVERALL PERFORMANCE

| Straddle | 1978 | | 1979 | | 1980 | | 1981 | | 1982 | | Net totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long-term gain (loss) | Short-term gain (loss) | Long-term gain (loss) | Short-term gain (loss) | Long-term gain (loss) | Short-term gain (loss) | Long-term gain (loss) | Short-term gain (loss) | Long-term gain (loss) | Short-term gain (loss) | |
| Silver | | ($496,360) | $986,570 | ($492,950) | | | | | | | ($2,740) |
| Soybean | | | | (125,075) | | $121,275 | | | | | (3,800) |
| T-Bond No. 1 | | | | (977,812) | ($332,812) | 120,030 | $474,344 | $714,156 | | | (2,094) |
| T-Bond No. 2 | | | | | | (2,296,406) | | (1,876,376) | | $4,144,280 | (28,502) |
| | 0 | (496,360) | 986,570 | (1,595,837) | (332,812) | (2,055,101) | 474,344 | (1,162,220) | 0 | 4,144,280 | (37,136) |

result clearly not intended) since the very nature of a straddle is such that the gross gain or gross loss on individual straddle positions (i.e., the legs), far exceeds the net gain or loss on the straddle taken as a whole.[35] We accordingly are of the opinion that the third factor does not provide any reasonable basis for rebutting the presumption, and that this part of respondent's temporary regulation is invalid.

We must also determine whether the presumption is applicable to the day trades involved herein.

To reiterate, a day trade occurs when a trader buys or sells an outright or straddle position at one point during the day, and acquires an offsetting position at a later point during the day, hoping to profit from price movements occurring during the day. The Clearing Corp. has programmed its computer to automatically offset the positions acquired during the day against one another. For the day trades in issue, however, Perlin utilized special instructions to prevent the automatic offset, so that the computer would revert to the FIFO method when calculating the effects of the trade. As our findings show, use of the special instructions resulted in short-term capital gains of $1,763 on December 13, 1979, and $981,750 on December 9, 1980; and short-term capital losses of $96,350 on December 13, 1979, $30,000 on December 28, 1979, $487,719 on December 2, 1980, and $946,688 on December 9, 1980. If the special instructions had not been used, the short-term capital gains would have respectively been $1,763 and $0. The respective short-term capital losses would have been $2,350, $500, $219, $0 and $0.

---

[35]Throughout this case, respondent has urged the alleged substantial disproportion between the tax losses claimed by petitioners in the years in issue versus the net economic effect of the entire straddle transactions, taken as a whole, and respondent uses this as a justification for disallowing the losses claimed. By this same analysis, however, petitioners reported "disproportionate" gains on other legs of their straddle transactions, in amounts not much less than the reported losses, viewed in the overall. It does not appear from this record that respondent has eliminated these "disproportionate" gains from petitioners' income. Assuming, arguendo, that such gains and losses were "disproportionate" to the overall economic effects of the straddles, the results were nevertheless consistent with two fundamental rules of tax accounting: (a) That gains and losses are to be reported in the years when realized, viz, by a final sale, and (b) that income is to be reported on an annual basis. Congress may have intended to change these rules by enacting sec. 1256 of the Code, but such change was not retroactive to the years before us. Sec. 503(a), Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 327-330.

Respondent argues that the losses resulting from the day trades were artificially created and thus not allowable.[36] Petitioners, of course, take a contrary position.

We note initially that under the CFTC regulations, a trader is always permitted to identify the position he wishes to close out. 17 C.F.R. sec. 1.46(b)(1980). If no such identification is made, the Clearing Corp. will offset the position on a FIFO basis. As for day trades, the regulations permit the Clearing Corp., if it does not receive specific instructions from the customer, to offset trades within the same day against each other prior to application of the FIFO rule. 17 C.F.R. sec. 1.46(c)(1980). Thus, Perlin's use of special instructions was consistent with the requirements of these regulations.

A useful analogy is provided in the Income Tax Regulations concerning the treatment of stock sales. Where an investor is selling stock from a portfolio held by his broker, he may identify the specific shares to be sold, or he may assume that the shares are disposed of on a FIFO basis. Sec. 1.1012-1(c)(1) to (3), Income Tax Regs. Similarly, here Perlin had elected pursuant to the CFTC regulations to use the FIFO method in determining which futures contracts were offset.

Though it appears that use of the special instructions created large tax losses, we know of no authority which suggests that a seller of property must sell property that would produce a gain prior to selling property that would produce a loss. Additionally, the record indicates that special instructions were also used so as to realize a profit of $93,750 on November 12, 1980, in T-Bond Straddle No. 2 instead of a loss of $1,617,187.50, which would have resulted if the instructions had not been used. We now turn to the applicability of the presumption that the day trades

[36]In support of this proposition, respondent cites *McWilliams v. Commissioner*, 331 U.S. 694 (1947); *Higgins v. Smith*, 308 U.S. 473 (1940); *Fender v. United States*, 577 F.2d 934 (5th Cir. 1978); *Fox v. Commissioner*, 82 T.C. 1001, 1018 n. 15 (1984), and *Horne v. Commissioner*, 5 T.C. 250 (1945). *McWilliams*, *Higgins* and *Fender* involved the disallowance of losses on sales between related parties and have no application to the facts here. The footnote in *Fox* cited by respondent is similarly inapplicable since it dealt with an *error* in the clearing firm's reporting practices. In *Horne*, a member of the New York Coffee and Sugar Exchange purchased an additional seat on the Exchange and 8 days later sold his old seat at a loss. In disallowing the loss in *Horne*, we relied primarily on what is now sec. 1031. The parties in the instant matter did not present arguments concerning the applicability of sec. 1031, and for that reason, we have chosen not to delve into the ramifications of sec. 1031 here.

were entered into for profit. Because petitioners' were commodity dealers or persons actively engaged in commodity futures, the presumption is available. Moreover, we do not feel that the presumption has been rebutted for the same reasons we articulated, *supra*, concerning the straddle transactions. As such, the day trades are presumed to have satisfied the entered into for profit requirement of section 108 of the act.[37]

In sum, we hold that the presumption in section 108(b) of the Act applies to petitioners' investments in the straddle transactions for the taxable years ending December 31, 1978, through December 31, 1980.[38] Therefore, because the presumption was not rebutted by respondent, the transactions satisfied the entered into for profit requirement of section 108 of the act.

Having decided that all of the straddle transactions for the taxable years in issue satisfied the requirements of section 108 of the act, it is unnecessary to reach the third issue concerning section 6621(d).

To reflect the foregoing, as well as concessions made by both parties,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, GOFFE, NIMS, WHITAKER, HAMBLEN, COHEN, CLAPP, SWIFT, WRIGHT, and PARR, *JJ.*, agree with the majority opinion.

WILBUR, GERBER, and WILLIAMS, *JJ.*, did not participate in the consideration of this case.

---

SIMPSON, *J.*, dissenting: A decision in this case requires us to revisit *Miller v. Commissioner*, 84 T.C. 827 (1985), on appeal (10th Cir., Nov. 20, 1985). I remain of the view that

---

[37] Respondent also makes similar arguments concerning the switch transactions. We reject these arguments for the same reasons previously stated in the text.

[38] We feel that it would have been unduly burdensome to determine the applicability of the presumption using a straddle-by-straddle approach and therefore opted to discuss the presumption as applied to the straddle transactions taken as a whole and as applied to the day trades. Cf. *Miller v. Commissioner, supra* at 843. In any event we do not believe that using a straddle-by-straddle analysis would have yielded a different result.

we made a mistake in *Miller*, and we are compounding that mistake by the decision of the majority in this case.

In *Miller*, we did not apply the presumption of section 108(b); here, we have a dealer or trader, who is entitled to that presumption. In describing the effect of the presumption, the committee report states, "the provision is to be applied by presuming that the position is held as part of a transaction entered into for profit unless the Internal Revenue Service establishes to the contrary." H. Rept. 98-861 (Conf.)(1984), 1984-3 C.B. (Vol. 2) 1, 171. Thus, even a dealer or trader is not automatically entitled to deduct his losses. There is still a question of whether the transaction was entered into for profit, but the Commissioner has the burden of proving that the dealer did not have a profit motive.

The regulations provide that in determining whether a transaction was entered into for profit, one factor to be considered is "the extent of straddle transactions having tax results disproportionate to economic consequences." Sec. 1.165-13T, A-5, Temporary Income Tax Regs. Such regulation does not provide that merely because there are large tax losses, the for-profit test is failed and the losses are disallowed. The regulation merely requires that the extent of tax losses and economic gains be considered in determining whether the transaction was entered into for profit.

The majority concludes that since dealers and traders ordinarily have large tax losses, a test that considers such losses is invalid. However, in my view, it is altogether appropriate to examine the results of the dealer's trading to ascertain whether he, in fact, realizes any significant economic gains. I cannot believe that Congress meant to allow a deduction for losses where a dealer persistently and deliberately incurred large tax losses, and no economic gains. The economic gains need not equal the losses, but where there is a continuing history of no economic gains, and no reasonable prospect of economic gains, I am convinced that Congress did not intend to allow the use of tax losses to defer the reporting of income.

In summary, I remain of the view that section 108 was not intended to alter the historic for-profit test. Under

section 108(b), there still must be a determination of whether the transaction was entered into for profit; that provision merely shifts to the Commissioner the burden of proving that the taxpayer lacked a profit motive.

CHABOT, PARKER, SHIELDS, and JACOBS, *JJ.*, agree with this dissent.